UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------- X
:
JOHN CAVELLI, et al.,                                    :
:
                                Plaintiffs,              :
:
                -against-                                :
:
NEW YORK CITY DISTRICT COUNCIL                           :
OF CARPENTERS, et al.,                                   :
:
                                Defendants.              :
:
------------------------------------------------------- X

**MEMORANDUM**
**DECISION AND ORDER**

10 Civ. 3708 (BMC)

**COGAN**, District Judge.

This is an action for retaliatory discharge under § 101(a)(2) of the Labor-Management Reporting and Disclosure Act ("LMRDA"), 29 U.S.C. § 411(a)(2). Defendant New York City District Council of Carpenters ("NYCDCC") employed plaintiffs John Cavelli and Anthony Rugolo as union organizers until March 2009, when it terminated their employment. Cavelli and Rugolo contend that NYCDCC terminated them, in violation of the free speech rights provided for under the LMRDA, because they spoke out against the union's leadership. NYCDCC maintains that it fired Cavelli and Rugolo because they were operating an OSHA training school without their supervisors' permission, potentially using union resources to advance their school, and training non-union students. The case is before me on NYCDCC's motion for summary judgment.[1]

---

[1] I previously dismissed other claims alleged in Cavelli and Rugolo's complaint. See Cavelli v. N.Y. City Dist. Council of Carpenters, No. 10 Civ. 3708 (E.D.N.Y. Mar. 7, 2011). They stipulated to the dismissal with prejudice of all claims against former defendant Michael Forde. See Docket Entry No. 43. Former plaintiff DLB Trinits, Inc. stipulated to the dismissal with prejudice of its claim for prospective interference with economic advantage. See Docket Entry No. 44.

I hold that Cavelli and Rugolo executed releases that bar their respective LMRDA claims. Moreover, even assuming the releases did not bar their claims, no reasonable jury could find that Cavelli and Rugolo's termination related to NYCDCC's purported scheme to suppress dissent within the union, or that their termination directly threatened union members' free speech rights. Accordingly, NYCDCC's motion is granted.

## BACKGROUND

I have taken the facts set forth herein from the parties' affidavits, exhibits, and Rule 56.1 statements, and have viewed them in the light most favorable to Cavelli and Rugolo as the nonmoving parties. See Capobianco v. City of New York, 422 F.3d 47, 50 n.1 (2d Cir. 2005). The facts are undisputed except as noted.

## I. The Financial Condition of the Officers' Pension Plan and the Opt-Out Provision

As employees of NYCDCC, Cavelli and Rugolo were beneficiaries under NYCDCC's Officers' Pension Plan (the "Plan"). Only NYCDCC's employees and staff were beneficiaries, members of "the union at large" were not.

At some point in 2003, Peter Thomassen (NYCDCC's President) informed Plan beneficiaries about a proposed "opt-out" provision to the Plan. Under the opt-out provision, an annuity would be set up independent of the Plan. Eligible beneficiaries (those who met either an age or years-of-service requirement and had "maxed out" their pension contributions to the Plan) would be allowed to make their pension contributions to the annuity rather than to the Plan; ineligible beneficiaries would not share in contributions made to the annuity.

When Thomassen first mentioned the opt-out provision in 2003, the Plan "was over funded" and "in great condition." By 2006, however, that had changed. The Plan's financial condition had declined, and, in March 2007, the Plan's actuary reported that the Plan was

underfunded by $11 million. To counteract the financial decline of the Plan, Thomassen initially informed beneficiaries that they would no longer accrue credit under the Plan. The Plan's actuary subsequently informed the beneficiaries that their scheduled raises would be diverted to offset the underfunded amounts in the Plan. In addition, he explained other measures that would be used to reduce the deficiency. Although the specifics of these measures are not clear, the net result was going to be a reduction in pension benefits.

Cavelli and Rugolo were upset about the decline of the Plan and the measures taken in response. Rugolo consistently voiced opposition at meetings held at NYCDCC's office. He specifically references three such meetings, which were held in January 2006, March 2007, and September 2007. During these meetings, Rugolo raised concerns about the Plan's financial condition and questioned whether the proposed opt-out provision had anything to do with its decline. NYCDCC's leadership (namely Thomassen and Michael Forde) did not respond well to Rugolo's out-spoken criticism of the Plan and the opt-out provision. During the meetings, Thomassen constantly tried to silence Rugolo by banging his gavel. Thomassen and Forde also cursed and yelled at him, told him he was "out of order," ordered him to sit down, and accused him of not being a "team player." Shortly after the January 2006 meeting, Forde and Eddie McWilliams (Rugolo's boss) separately reprimanded Rugolo for speaking out and for not being a "team player." And, after the March 2007 meeting, Rugolo claims NYCDCC sent him to work as an organizer in "the outer regions of Staten Island" as a punishment for speaking up and so that he "could not talk to anybody."

Unlike Rugolo, Cavelli did not speak out against the opt-out provision or the Plan's financial condition during these three meetings (or during any other meetings). Rather, he objected "on the side" because he is a "sideline kind of guy." Despite his lack of public

criticism, on at least two occasions, NYCDCC leadership reprimanded Cavelli for speaking out. First, in August 2007, Cavelli had a private discussion with Forde about the Plan's financial condition. Forde told Cavelli to "shut up" and suggested that continued complaints would result in termination. Nevertheless, Cavelli continued to "speak[] out" about the Plan's financial condition "on the sidelines to men." As a result, in September 2007, he was called into a meeting with Forde and others. Forde told him that he was not being a "team player" and threatened to fire him if he continued.

After September 2007, Rugolo admits that the opt-out provision was never mentioned at meetings again. He did, however, continue to "complain" and "talk" about the Plan's condition during "almost every meeting." Forde, Thomassen, and others told him that meetings were not the place to discuss the Plan. In addition, Rugolo also continued talking to Forde privately about the Plan's condition. Forde told Rugolo "to be more one of us [referring to NYCDCC's leadership]." There is nothing in the record suggesting that Cavelli continued to speak out about the Plan's financial condition after September 2007.

## II.     Cavelli and Rugolo's Termination

In April 2008, Rugolo incorporated DLB Trinits, Inc. ("DLB"). Although he did not conduct any business through DLB at first, Rugolo eventually began to offer OSHA training courses through the company. Rugolo is DLB's only shareholder. Cavelli is a consultant and teaches some of the courses.

The parties dispute when and how NYCDCC learned of DLB. Cavelli and Rugolo maintain, albeit in a conclusory manner, that they received NYCDCC's permission to operate DLB before they started offering training courses;[2] NYCDCC maintains that it learned of DLB

---

[2] It is clear that Cavelli and Rugolo never received NYCDCC's specific permission to operate an OSHA training school. Cavelli and Rugolo claim that they received such permission from Forde and Stuart GraBois. Rugolo,

after-the-fact. Regardless, on March 7, 2009, Maurice Leary (NYCDCC's Director of Operations) visited the building where Cavelli and Rugolo were teaching a course. Leary told Cavelli and Rugolo that Thomassen, Forde, and Denis Sheil wanted to meet with them and that they should bring paperwork for DLB's students to the meeting.

Cavelli and Rugolo attended this meeting on March 10. Rugolo brought with him DLB's sign-in sheets from three classes. At the meeting, Thomassen accused them of keeping DLB a secret from NYCDCC and of teaching "non-union workers." Someone (presumably Thomassen) suspended Cavelli and Rugolo for secretly operating DLB, for training non-union workers, or, perhaps, for doing both.

Cavelli and Rugolo then attended a second meeting with Forde, Thomassen, and Sheil on March 12. At this meeting, Thomassen and Forde told Cavelli and Rugolo that they were going to terminate their employment as union organizers at NYCDCC. Thomassen yelled and cursed at Cavelli and Rugolo and once again accused them of teaching non-union workers. Thomassen gave them each copies of release agreements and "told [them] that if [they] did not sign [the releases], he was throwing them out of the Union and bringing [them] to carpenter court to get [them] expelled." He also threatened them with the loss of their medical benefits (for them and their families) "the very next morning."

Cavelli and Rugolo returned to NYCDCC on March 17. They admit that they read the releases a few times between March 12 and March 17; however, they claim that they did not understand the terms. Even though Cavelli and Rugolo had not consulted with lawyers, the

---

however, merely testified that he asked Forde if he could "go out and get a second job" and Forde told him that "as long as [he was] not swinging a hammer and working with the tools, [he had his] blessing." Rugolo did not tell Forde about DLB, or that he would be operating an OSHA training school. Similarly, Rugolo testified that Cavelli asked GraBois whether "there was anything wrong with it." He does not explain what Cavelli actually asked GraBois. And, even assuming Cavelli explained the specifics of DLB, GraBois is the Director of NYCDCC's Benefits Funds, which is a separate and legally distinct entity from NYCDCC. GraBois does not hold a position with NYCDCC. He could not have given Cavelli and Rugolo NYCDCC's permission to operate DLB, and his knowledge of DLB would not be imputed to NYCDCC.

releases indicated that they had.[3]  Rugolo requested that the provision in his release be removed or that he be given a chance to consult with a lawyer.  Leary refused Rugolo's request and told him to sign the release.  Cavelli and Rugolo signed the releases that day.

There is no dispute that the releases Cavelli and Rugolo signed "contain broad general releases of all claims . . . , including, specifically for claims brought under the [LMRDA]."[4]  In fact, except for the provisions related to representation by counsel, Cavelli and Rugolo do not in any way challenge the substance of the releases.

As consideration for signing the releases, NYCDCC paid Cavelli and Rugolo $35,000 and $27,000 respectively.  In addition, NYCDCC provided Cavelli and Rugolo with medical benefits through June 30, 2009.  Rugolo testified that NYCDCC did not pay for his medical benefits because he was working as a carpenter from March until June and therefore received his medical benefits from the union as a union member.  He also admitted, however, that he did not know whether NYCDCC paid for his medical benefits pursuant to the terms of the release.

## DISCUSSION

### I.      Summary Judgment Standard

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment is warranted where the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A genuine dispute

---

[3] Rugolo's release contained the following provision: "Rugolo acknowledges that he has been represented and advised by counsel in connection with all aspects of this Agreement."  Cavelli's release contained the same provision.

[4] Cavelli and Rugolo agreed to "release[] any and all claims and rights which [they] had, [have] or may have against the following entities and persons, both in their individual and official capacities, District Council for New York City and Vicinity, International Brotherhood of Carpenters and Joiners of America, the International Brotherhood of Carpenters and Joiners of America, all of their subsidiary or affiliated unions or other entities, and any of the past, present or future officers, directors, trustees, fiduciaries, administrators, employees, service providers, volunteers, agents, members, successors and assigns."  The releases specifically apply to "all claims resulting from anything that has happened from the beginning of time up to and including the Agreement Effective Date," and they "include[] any claims under: . . . the Labor-Management Reporting and Disclosure Act."

exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505 (1986). A fact is material if it "might affect the outcome of the suit under the governing law." Id.

Once the moving party has met its burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts. . . . [T]he nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial*." Caldarola v. Calabrese, 298 F.3d 156, 160 (2d Cir. 2002) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87, 106 S. Ct. 1348 (1986)). "Bald assertions or conjecture unsupported by evidence are insufficient to overcome a motion for summary judgment." Zdziebloski v. Town of E. Greenbush, 336 F. Supp. 2d 194, 201 (N.D.N.Y. 2004) (citing Carey v. Crescenzi, 923 F.2d 18, 21 (2d Cir. 1991)). In determining whether genuine issues of material fact exist, I am required to "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." Patterson v. Cnty. of Oneida, 375 F.3d 206, 219 (2d Cir. 2004).

## II.    Releases

It is undisputed that Cavelli and Rugolo executed releases on March 17, 2009 and that those releases cover their LMRDA claims. Cavelli and Rugolo, however, maintain that the releases are voidable because they were executed under economic duress. NYCDCC, in turn, argues that the no reasonable jury could find that the releases were executed under duress and, alternatively, that even if there is a disputed issue of material fact as to duress when the releases were executed, Cavelli and Rugolo failed to timely repudiate them, thereby ratifying them.

## A. Legal Standard

The first issue I must determine is whether New York or federal law governs Cavelli and Rugolo's duress claim. Cavelli and Rugolo assert that New York law applies. NYCDCC claims that federal law applies. Although it is true that "[f]ederal law governs all questions relating to the validity of and defenses to purported releases of federal statutory causes of action[,] . . . it does not necessarily follow from the fact that federal law governs that [courts] must fashion a uniform federal rule of decision." <u>VKK Corp. v. Nat'l Football League</u>, 244 F.3d 114, 121-22 (2d Cir. 2001) (internal citations and quotation marks omitted). Rather, "state rules of decision will [frequently] furnish an appropriate and convenient measure of the governing law." <u>Id.</u> at 122 (internal quotation marks omitted).

Because there is no "congressional directive instructing [courts] to formulate a uniform federal standard for determining whether a release of [LMRDA] claims is invalid on the basis of economic duress," I must "look to the three-part test enunciated by the Supreme Court in <u>United States v. Kimbell Foods, Inc.</u>, 440 U.S. 715, 728-29, 99 S. Ct. 1448 (1979)." <u>Id.</u> at 122. This test requires courts to "assess whether: (1) the issue requires a nationally uniform body of law; (2) application of state law would frustrate specific objectives of the federal programs; and (3) application of a federal rule would disrupt commercial relationships predicated on state law." <u>Id.</u> (internal quotation marks omitted).

It is clear that the first two factors weigh in favor of applying New York law. Although "there is a federal interest in vindicating rights arising out of federal enactments, the validity of a release of [LMRDA] claims does not involve the duties of the Federal Government, the distribution of powers in our federal system, or matters necessarily subject to federal control even in the absence of statutory authority." <u>Id.</u> (internal quotation marks omitted). Moreover,

"under the third factor, a national standard for releases might interfere with the reasonable expectations of the parties to a contract" because "[i]t is not unusual for releases, like other contracts, to state specifically that state law governs."[5] Id. As for the second factor, Congress passed the LMRDA "to eliminate or prevent improper practices on the part of labor organizations, employers, labor relations consultants, and their officers and representatives." 29 U.S.C. § 401(c); see also Franza v. Int'l Bhd. of Teamsters, Local 671, 869 F.2d 41, 44 (2d Cir. 1989) ("The principal reason for the enactment of the LMRDA was to correct widespread abuses of power and instances of corruption by union officials, and to encourage democratic self-governance in unions."). Allowing state law, as opposed to a judicially-crafted federal standard, to govern will not frustrate Congress's stated purpose in passing the LMRDA. Thus, application of the Kimbell Foods factors compels application of New York law to Cavelli and Rugolo's duress claim.[6]

In New York, "[a] contract is voidable on the ground of duress when it is established that the party making the claim was forced to agree to it by means of a wrongful threat precluding the exercise of his free will." First Nat'l Bank of Cincinnati v. Pepper, 454 F.2d 626, 632 (2d Cir. 1972) (quoting Austin Instrument, Inc. v. Loral Corp., 29 N.Y.2d 124, 130, 324 N.Y.S.2d 22 (1971)). To establish economic duress, plaintiffs must show "(1) a threat, (2) which was unlawfully made, (3) and caused involuntary acceptance of contract terms, (4) because the circumstances permitted no other alternative." Kamerman v. Steinberg, 891 F.2d 424, 431 (2d

---

[5] In fact, the releases in question each contained the following provision: "This Agreement shall be interpreted, construed, governed and enforced according to the laws of the State of New York, except to the extent that federal law may govern."

[6] It is also worth noting that, although NYCDCC claims federal law governs, the majority of cases it cites in support of its duress-related arguments apply New York law.

Cir. 1989); see also Mazurkiewicz v. N.Y. City Health & Hosps. Corp., 585 F. Supp. 2d 491, 500 (S.D.N.Y. 2008) (internal quotation marks omitted).

Cavelli and Rugolo testified at deposition that Thomassen made two wrongful threats that caused them to execute the releases under duress. First, Thomassen threatened to take them to "carpenter court" to have them expelled from the union. Second, he threatened them with the immediate loss of the medical benefits they received by virtue of their employment with NYCDCC.

## B. Wrongful or Unlawful Threats

Assuming these threats were made, NYCDCC first argues that they were not wrongful or unlawful and therefore cannot form the basis for a duress claim. It is well settled that "[a] mere threat to do that which one has the legal right to do does not constitute duress." Lyons v. Lyons, 289 A.D.2d 902, 904, 734 N.Y.S.2d 734 (3d Dept. 2001) (internal quotation marks omitted); see also 2 Broadway LLC v. Credit Suisse First Boston Mortg. Capital LLC, No. 00 Civ. 5773, 2001 U.S. Dist. LEXIS 4875, *24-25 (S.D.N.Y. Apr. 23, 2001). The threat related to expulsion from the union clearly falls within this category. Cavelli and Rugolo both testified that Thomassen threatened to take them to "carpenter court" to have them expelled from the union. Cavelli testified that "[he] knew [carpenter court] meant trial." And Thomassen and Sheil both detail the process afforded members who are brought up on internal charges.[7]

There was nothing wrongful or unlawful about Thomassen threatening to take Cavelli and Rugolo to "carpenter court" to have them expelled from the union. The Carpenters'

---

[7] There would first be a trial before a Trial Committee made up of a panel of union peers. At this trial, Cavelli and Rugolo would have had a "right to put on witnesses and [introduce] evidence, and rights of appeal to the highest governing International union body." The charges could result in expulsion from the union, but they could also result in lesser sanctions. The Trial Committee would have recommended a penalty and then the delegate body would have voted on whether to approve it. These procedures are reflected in the Carpenters' Constitution, which Cavelli and Rugolo annexed to their opposition.

Constitution provides a mechanism for bringing such charges and expulsion is one possible outcome. (Cavelli himself subsequently tried to bring internal union charges against Thomassen and Forde for their roles in his termination.) In other words, Thomassen threatened to undertake a permissible course of action against Cavelli and Rugolo if they refused to sign the releases. This cannot constitute duress. See Lyons, 289 A.D.2d at 904, 734 N.Y.S.2d 734; see also Garner v. Garner, 46 A.D.3d 1239, 1240, 848 N.Y.S.2d 741 (3d Dept. 2007); Societe Financiere de Banque v. Bitter-Larkin, 248 A.D.2d 298, 298, 670 N.Y.S.2d 87 (1st Dept. 1998) (noting that "the threat of a civil lawsuit . . . [does not] constitute[] economic duress").[8]

However, the threat regarding the immediate loss of medical benefits is a different issue. NYCDCC states, in general terms, that "most employees . . . lose employer-provided medical benefits when they are terminated" and that "[t]he benefits funds affecting the NYCDCC are structured such that an employee generally has health benefits paid for in advance and extending to the end of the quarter, even upon termination." NYCDCC does not offer any specifics about Cavelli and Rugolo's benefits, nor does it cite to any evidence in the record proving that it had the legal authority to *immediately* terminate Cavelli and Rugolo's medical benefits following termination (as Thomassen threatened to do). Absent such proof, I cannot find, as a matter of law, that this alleged threat was not unlawful or wrongful for purposes of Cavelli and Rugolo's duress claim.

---

[8] To the extent Cavelli and Rugolo are arguing that their alleged conduct – operating DLB without their supervisors' permission and training non-union workers – was not the proper subject of internal union charges, such an argument is insufficient to raise a factual issue necessitating trial. New York courts have held that, for purposes of duress claims, a party's threat to enforce its own interpretation of its rights is not wrongful or unlawful. See Interpharm, Inc. v. Wells Fargo Bank, N.A., No. 08 Civ. 11365, 2010 U.S. Dist. LEXIS 32318, at *24 (S.D.N.Y. Mar. 31, 2010) (noting that "threats to enforce a party's legal rights under a contract – or even that party's interpretation of its rights – cannot constitute a wrongful threat sufficient to establish a claim of economic duress").

## C. No Other Alternatives

NYCDCC next argues that the undisputed facts show that Cavelli and Rugolo had other alternatives available to them besides signing the releases. I agree. Cavelli and Rugolo clearly had an alternative with regards to Thomassen's threat to take them to "carpenter court" – they could have proceeded with the internal union charges and defended themselves against NYCDCC's accusations.[9] As for the loss of their medical benefits, they could have refused to sign the releases, obtained COBRA insurance if Thomassen carried out the threat,[10] and sued for any unlawful withholding of benefits. See Drakakis v. ABM Janitorial Servs.-Ne., Inc., No. 09 Civ. 1884, 2011 U.S. Dist. LEXIS 34211, at *15 (S.D.N.Y. Mar. 24, 2011); Pallonetti v. Liberty Mut., No. 10 Civ. 4487, 2011 U.S. Dist. LEXIS 14529, *14 (S.D.N.Y. Feb. 11, 2011).

Notably in this regard, Cavelli and Rugolo fail to offer any evidence, except for their own conclusory assertions, showing that they had no other option but acquiescence in the face of Thomassen's threats. In a typical duress claim, one party threatens to withhold performance under a contract unless the other party agrees to alter the terms of the contract. In these situations, New York imposes a burden on the party claiming duress to demonstrate an inability to obtain performance elsewhere. See generally Austin Instrument, Inc., 29 N.Y.2d 124, 324 N.Y.S.2d 22. I see no reason why Cavelli and Rugolo should not be held to a similar standard. They seek to void contracts they both executed because they claim NYCDCC threatened to expel

---

[9] Cavelli testified that he "was on the trial committee" and that "if Peter Thomassen wanted [him] thrown out expelled, that day, [he] would have been thrown out." He did not, however, offer any details substantiating this conclusory assertion, nor did he explain how immediate expulsion was possible given the undisputed procedures in place. It is therefore insufficient to defeat summary judgment. See Davis v. New York, 316 F.3d 93, 100 (2d Cir. 2002). Moreover, Cavelli's subjective and undisclosed belief that Thomassen could have him immediately expelled notwithstanding Thomassen's threat to take him to "carpenter court" cannot constitute duress. See Rockmore v. Antell, No. 07 Civ. 3592, 2008 U.S. Dist. LEXIS 78899, at *15 (S.D.N.Y. Sept. 25, 2008) ("New York courts have found that, 'self-imposed, undisclosed, and subjective fears do not constitute an act of duress by the defendant cognizable in law.'").

[10] NYCDCC's Personnel Policy Manual contains a section on COBRA insurance, and Cavelli did in fact obtain such insurance after the medical benefits he received pursuant to the terms of his release ran out.

them from the union and to immediately terminate their medical benefits. To do so, they must present some admissible evidence (not conclusory assertions) showing how they would have been unable to obtain work or medical benefits elsewhere if they refused to sign the releases. They did not; their duress claim must therefore fail.[11]

## D. Failure to Timely Repudiate

Even assuming there is an issue of fact as to whether Cavelli and Rugolo executed the releases under duress, they failed to timely repudiate the releases. Because a contract executed under duress is voidable (rather than void), "the person claiming duress must act promptly to repudiate the contract or release or he will be deemed to have waived his right to do so." VKK Corp., 244 F.3d at 122 (citations and internal quotations omitted). "The burden on a party seeking to avoid contractual obligations on the grounds of economic duress increases proportionately with the delay in initiating suit or otherwise repudiating the contract in question." Id. Courts have held that delays as short as six months have constituted forfeiture of a duress claim. See id. at 123 (citing DiRose v. PK Mgmt. Corp., 691 F.2d 628, 634 (2d Cir. 1982)).

In the instant case, Cavelli and Rugolo both received benefits pursuant to the terms of the releases they now seek to avoid. In addition, they both negotiated with NYCDCC after-the-fact regarding the method of payment and certain tax-related issues further signaling their intention to ratify the releases. It was not until May 2010 (over one year after signing the releases) that they signaled to NYCDCC their intention to repudiate (by sending NYCDCC a cease and desist letter). Under these circumstances, Cavelli and Rugolo have waived their right to challenge the

---

[11] In their memorandum of law, Cavelli and Rugolo state that their "allegations, if proved, would support a finding that they executed the Releases under economic duress." Similarly, in their Rule 56.1 Counterstatement, Cavelli and Rugolo cite an allegation in their complaint as support for the assertion that "membership in the union is essential to their livelihood." It is well settled that mere allegations, either in pleadings or memoranda, are insufficient to defeat summary judgment. See Davis, 316 F.3d at 100. Moreover, it bears repeating that Thomassen did not threaten immediate expulsion from the union. He threatened to take Cavelli and Rugolo to "carpenter court." Although expulsion could have been a possible outcome, it would not have been immediate. And Cavelli and Rugolo could have received lesser sanctions, or they could have been exonerated.

releases.[12]  See Cappelli Enters., Inc. v. F&J Cont. Food Corp., 16 A.D.3d 609, 610-11, 792

N.Y.S.2d 553 (2d Dept. 2005).

In an attempt to explain away the long delay in repudiating, Cavelli and Rugolo raise

three arguments, none of which have merit.  First, they argue that the duress they suffered was

ongoing and therefore they were under no obligation to repudiate.  Second, they argue that their

post-termination actions are inconsistent with ratification.  Finally, they argue that they were

under no legal obligation to "tender back" the benefits they received pursuant to the releases.

First, there is no question that the duress ceased once Cavelli and Rugolo signed the

releases.  They agreed to Thomassen's demand, thereby ending any possibility that he would

carry out the threats.  In fact, the releases indicate that NYCDCC would not bring internal union

charges against Cavelli and Rugolo (i.e., Thomassen would not take them to carpenters court)

and that NYCDCC would provide Cavelli and Rugolo with medical benefits until June 30, 2009

(i.e., Thomassen would not take away their medical benefits immediately).  Accordingly, the

crux of Cavelli and Rugolo's argument is not that the threats were *ongoing*, but rather that the

threats would be *renewed* if they repudiated.  See Kovian v. Fulton Cnty. Nat'l Bank & Trust

Co., 857 F. Supp. 1032, 1040 (N.D.N.Y. 1994).  As the court held in Kovian, "[t]his argument

does not suffice to preclude ratification [based on ongoing duress]" because Cavelli and Rugolo

could have sued to rescind the releases and also to prevent NYCDCC from carrying out the

unlawful or wrongful acts.  Id.; see also Landau v. American Int'l Group, No. 97 Civ. 3465, 1997

U.S. Dist. LEXIS 14325, at *11-12 (S.D.N.Y. Sept. 23, 1997).  In other words, the releases

---

[12] Cavelli and Rugolo argue that Cavelli tried to bring internal union charges against Forde and Thomassen for their roles in his termination sometime in the fall of 2009 and that this constituted a timely act of repudiation.  In the charges, Cavelli alleges that Forde and Thomassen "violated the Obligation" and the "primary objective to protect memberships' interest" during the March 12 meeting.  I do not think these bare allegations constitute an effective repudiation.  And, even if they do, the charges are dated March 16, 2010 (not sometime in the fall of 2009).  Thus, even if the charges are properly considered as Cavelli's act of repudiation, the act is still untimely as it occurred a year after he executed his release.

served to simultaneously remove the alleged wrongful and unlawful threats and provide Cavelli and Rugolo with an alternative to continued acquiescence thereby foreclosing any possibility of an ongoing duress.

Moreover, even assuming the cloud of Thomassen's threats continued to hover over Cavelli and Rugolo after they executed the releases, no reasonable jury could find that their "free will" was overcome by the possibility of NYCDCC retaliating against them. Almost immediately after they executed the releases, Rugolo began searching for legal representation (presumably to challenge his termination), but was unable to retain an attorney because they either outright refused the representation or because they wanted cost-prohibitive retainers. In addition, on October 16, 2009, Cavelli publicly testified under oath at a "Special Hearing on the New York City & Vicinity District Council of Carpenters." During his testimony, Cavelli criticized NYCDCC's "nepotism and cronyism." He also advocated for changing NYCDCC by "clean[ing] house," and "wip[ing] the slate clean." Then, in March 2010, Cavelli tried to bring internal union charges against Forde and Thomassen for their roles in his termination.

Based on the foregoing, it is clear that Cavelli and Rugolo were not, as they claim, under ongoing duress after they executed the releases. Had they found representation in April 2009, when Rugolo began looking for a lawyer, they would have brought the instant action much sooner than they did. The requirement of ongoing duress does not include the ability to persuade a lawyer to take the case. Rather, its purpose is to protect individuals when their free will is continuously overcome due to wrongful or unlawful threats. Rugolo's active search for a lawyer

and Cavelli's public testimony and internal union charges are fatally inconsistent with any argument that they fit this criterion.[13]

Second, Cavelli and Rugolo each submitted affidavits detailing their post-termination activity and argue that this activity is inconsistent with any act of ratification. Notably absent from their affidavits is any indication that they engaged in some conduct that would put NYCDCC on notice that they were repudiating the releases. The first time Cavelli and Rugolo signaled to NYCDCC their intention to challenge the validity of the releases occurred in May 2010, when they sent NYCDCC a cease and desist letter. This act occurred far too late to preserve their duress claim given the undisputed facts that they had received and retained benefits pursuant to the releases since sometime in March 2009. See DiRose, 691 F.2d at 634.[14]

Finally, Cavelli and Rugolo's argument that they were under no legal obligation to "tender back" the consideration they received from NYCDCC is misplaced. Although it is true that New York has abolished the "tender back" rule, see CPLR 3004, its rule requiring prompt repudiation remains in effect. Thus, CPLR 3004 presupposes a situation where a party has received benefits pursuant to a voidable contract, but has nonetheless timely repudiated. In such a case, the failure to "tender back" the benefits received is not fatal to the party's attempt to void the contract. But where, as here, Cavelli and Rugolo failed to timely repudiate, CPLR 3004 does not work to preserve their duress claim. See Prudential Ins. Co. of Am. V. BMC Industries, Inc., 630 F. Supp. 1298, 1303 (S.D.N.Y. 1986).

---

[13] Any "ongoing threat" relating to the loss of their NYCDCC-provided medical benefits unquestionably ceased on June 30, 2009, when NYCDCC stopped providing them medical benefits pursuant to the terms of their releases. This is still almost one year before Cavelli and Rugolo repudiated.

[14] Cavelli and Rugolo's reliance on Brown v. City of S. Burlington, 393 F.3d 337 (2d Cir. 2004) is unavailing as that case concerned Vermont law.

### III.    LMRDA

Even if the releases did not bar their claims, NYCDCC is still entitled to summary

judgment because no reasonable jury could find that Cavelli and Rugolo's termination related to

NYCDCC's purported series of oppressive acts, or that their termination directly threatened

union members' free speech rights.

Section 101(a)(2) of the LMRDA "guarantees to union members 'the right to meet and

assemble freely and to express any views, arguments, or opinions' concerning candidates and

union policies." Maddalone v. Local 17, United Bhd. of Carpenters & Joiners of Am., 152 F.3d

178, 183 (2d Cir. 1998) (quoting 29 U.S.C. § 411(a)(2)) (internal ellipses omitted).  Unions are

prohibited from "discipline[ing]" their members for "exercising [the] right[s] guaranteed by [§

101(a)(2)]." Id. (citing 29 U.S.C. § 529).

Because the LMRDA "was meant to protect *union members' rights as members*, not an

individual member's right to employment with the union," Franza, 869 F.2d at 45 (citing

Finnegan v. Leu, 456 U.S. 431, 439-41 & n.10, 102 S. Ct. 1867 (1982)), the general rule is that

"status as a union employee or appointed officer is not a membership right within a union and is

not protected by the LMRDA," Maddalone, 152 F.3d at 184 (citing Finnegan, 456 U.S. at 438,

102 S. Ct. 1867).  Nevertheless, unions are not allowed to discipline their employees "for the

purpose of suppressing or chilling [their] exercise of free speech rights or [the rights] of others *as

members*." Newman v. Local 1101, Commc'ns Workers of Am., 570 F.2d 439, 446 (2d Cir.

1978).

Accordingly, the Second Circuit recognizes an exception to the general rule announced in

Finnegan.  Union employees can maintain § 101(a)(2) claims if their terminations were "part of

[sic] purposeful and deliberate attempt to suppress dissent within the union." Maddalone, 152

F.3d at 184 (internal quotation marks and ellipses omitted). "To fall within this exception, . . . plaintiff[s] must present clear and convincing proof that [their] dismissal[s were] part of a series of oppressive acts by the union leadership that directly threaten the freedom of members to speak out." Id. (internal quotation marks omitted).

Often times, these claims are establishing by presenting proof that the union engaged in "a series or pattern of acts . . . which impact[ed] the rights of a number of dissident members or groups." Dilacio v. N.Y. City Dist. Council of the United Bhd. of Carpenters & Joiners of Am., 593 F. Supp. 2d 571, 583 (S.D.N.Y. 2008); see also Maddalone, 152 F.3d at 184 (noting that the Second Circuit has "allowed [these type of LMRDA] claims to go forward where the removal of an officer or employee stemmed from longstanding and well-documented patterns of harassment and intimidation"); Cotter v. Owens, 753 F.2d 223, 229-30 (2d Cir. 1985) (relying on lengthy history of intra-union conflict); Schonfeld v. Penza, 477 F.3d 899, 904 (2d Cir. 1973) (relying on 15-year history of litigation between dissident group and leadership of local union). In contrast, "isolated act[s] of retaliation" against individuals are insufficient to fit within the Second Circuit's exception to Finnegan. Cotter, 753 F.2d at 229-30; see also Maddalone, 152 F.3d at 185.

Because Cavelli and Rugolo are challenging NYCDCC's decision to terminate their employment with the union, they must qualify for the Second Circuit's exception to Finnegan to maintain their claim. As the above cited cases make clear, this means that Cavelli and Rugolo must raise issues of fact that would enable a reasonable jury to conclude that (1) NYCDCC engaged in a series of oppressive acts; (2) their termination was part of this series of oppressive acts; and (3) the free speech rights of union members were directly threatened as a result. Their claims fail as to the second and third issue.

## A. Causal Link Between Cavelli and Rugolo's Termination and NYCDCC's Series of Oppressive Acts

Although not at all clear from their submissions, Cavelli and Rugolo's theory of the case appears to be that Thomassen, Forde, and the rest of NYCDCC's leadership engaged in a series of oppressive acts by retaliating against anybody who ever spoke out against them or otherwise challenged their policies. Because Cavelli and Rugolo spoke out against the leadership, they argue, their subsequent termination was part of this series of oppressive acts.

Contrary to Cavelli and Rugolo's position, the mere fact that they spoke out against the leadership and were subsequently terminated is insufficient, on its own, to establish that their terminations were part of the series of oppressive acts. Rather, there needs to be some causal link between the speech, the oppressive acts, and the termination. To hold otherwise would render the requirement that a "dismissal [be] *part of* a series of oppressive acts by the union leadership" meaningless. Maddalone, 152 F.3d at 184 (emphasis added) (internal quotation marks omitted).

No reasonable jury could find a causal link between Cavelli's speech, the oppressive acts, and his termination.[15] There is no evidence that Cavelli complained about the opt-out provision or the Plan after September 2007, nor is there any evidence that he was harassed or threatened for any reason by NYCDCC's leadership during that period.[16] Accordingly, there was a year-and-a-half gap between Cavelli's "sideline" complaining, any related suppressive acts, and his

---

[15] Presumably because they were both terminated together, Cavelli and Rugolo conflate their individual situations into one claim. Thus, they generally make arguments as if both of their claims rise and fall together. There is, however, nothing to suggest that they were engaged in a concerted effort to oppose NYCDCC. The factual bases for each of their LMRDA claims against NYCDCC must be evaluated independently. In other words, Cavelli and Rugolo must both demonstrate a link between their own speech, the oppressive acts, and their termination.

[16] In their memorandum, Cavelli and Rugolo assert that, from September 2007 until March 2009 "[they] continued to complain about the opt-out provision and the status of the [Plan] at meetings, to no avail." The cite they offer in support of this assertion, however, is to a portion of Rugolo's deposition testimony, in which he testifies that he continued to complain during this period. Rugolo does not mention Cavelli, and there is no other evidence in the record suggesting that Cavelli likewise complained or otherwise spoke out during this period.

termination. Under these circumstances, no reasonable jury could infer that NYCDCC terminated him as *part of* a series of oppressive acts designed to suppress dissent within the union. Cf. Garrett v. Garden City Hotel, Inc., No. 05 Civ. 0962, 2007 U.S. Dist. LEXIS 31106, at *68-71 (E.D.N.Y. Apr. 19, 2007) (noting that, in Title VII cases, "district courts in this Circuit have consistently held that a passage of more than two months between the protected activity and the adverse employment action does not allow for an inference of causation").

Rugolo presents a closer question. He testified generally that from September 2007 through the date of his termination, he continued to ask about the Plan's financial condition at meetings. (He admits that he did not mention the opt-out provision after September 2007). According to him, he would "complain" and "talk" about the Plan during meetings. When he raised these concerns, the various people that chaired the meetings (including Thomassen and Forde) told him that meetings were not the place to discuss the Plan. In addition, Rugolo testified that he would speak with Forde privately about the Plan, either when he saw him around NYCDCC's office or after meetings. Forde would tell him things like he had "to sit down [during meetings]" and "be more one of us [referring to NYCDCC's leadership]."

Although Rugolo continued to complain about the Plan from September 2007 through the date of his termination, the "harassing and intimidating" conduct he faced as a result was of a far less severe nature than the conduct he faced in September 2007 and before (i.e., being yelled and cursed at during meetings, being sent to work in the "outer regions of Staten Island," and being threatened with termination). The post-September 2007 conduct does not rise to the level of suppressive behavior warranting application of the Second Circuit's exception to Finnegan. See Rodriguez v. Int'l Bhd. of Teamsters, No. 98 Civ. 8849, 1999 U.S. Dist. LEXIS 15811, at *8-9 (S.D.N.Y. Oct. 13, 1999) (holding that allegations that defendant "failed to call frequent

membership meetings, denied members' requests to discuss union business at [a] meeting, refused to permit a vote on a petition to end [defendant's] trusteeship, and attempted to secure membership signatures in a petition expressing support for [defendant's] trusteeship" fell "well below" the level of "harassment and intimidation previously recognized by the Second Circuit as justifying the exception" (internal quotation marks and citation omitted)). Accordingly, his LMRDA claim suffers from the same temporal infirmity as Cavelli's.

## B. Direct Threat to Union Members' Free Speech Rights

Even assuming there is a factual dispute as to whether Cavelli and Rugolo's termination was part of NYCDCC's scheme to suppress dissent, no reasonable jury could conclude that union members' free speech rights were directly threatened as a result. It is undisputed that Cavelli and Rugolo's speech concerned matters that wholly concerned their employment with NYCDCC. Cavelli did not publicly speak out in any manner that affected union members generally. And he was not harassed or intimidated in any way in so far as his membership in the union was concerned. Rather, he spoke out "on the sidelines," was threatened with termination, and was eventually terminated. Accordingly, the only inference to be drawn in so far as NYCDCC's treatment of Cavelli is concerned is that speaking out "on the sidelines" about employment-related matters may result in employment-related discipline. This conduct is not protected by the LMRDA.[17] See Bentivegna v. Fishman, No. 02 Civ. 4028, 2002 U.S. Dist. LEXIS 12974, at *45 (S.D.N.Y. July 17, 2002) ("Under Finnegan, it is perfectly permissible for

---

[17] In a disingenuous attempt to create a factual dispute about whether Cavelli spoke up at meetings, Cavelli cites Frank Schiavone's deposition testimony. Schiavone testified that he remembered Cavelli "talking to [him] about [the opt-out provision] at the meeting, like right there." That Cavelli spoke *to* Schiavone about the opt-out provision *at a meeting* does not suggest that he spoke out about it publicly *during a meeting*. And Cavelli does not in any way try to explain Schiavone's vague reference in light of his own admission that he did not speak in meetings. In any event, even assuming Cavelli did speak out about the opt-out provision at this one meeting, there is no evidence in the record showing that he was harassed or intimidated at the meeting, and his speech still concern matters wholly related to his employment with NYCDCC.

an elected union leader to instill into his or her subordinate appointed employees the fear that if they are openly disloyal to the elected leaders, their union employment will be jeopardized.").

Rugolo again presents a closer question. He testified that he spoke out at three specific meetings in January 2006, March 2007, and September 2007. It is undisputed that the meeting in January 2006 was for NYCDCC's business agents, organizers, and other staff members – i.e., it was an employment-related meeting in which union employees discussed employment-related matters (the Plan's financial condition). Accordingly, any harassment or intimidation that occurred at this meeting is not actionable under the LMRDA. See id.

In contrast, the March 2007 and September 2007 meetings were delegate meetings. The local unions elect delegates to serve as representatives before NYCDCC. Because these meetings involved union members' elected representatives, any harassment or intimidation directed at the delegates could potentially be felt by or otherwise impact rank-and-file members' ability to speak out themselves. See Maddalone, 152 F.3d at 185. Nevertheless, Rugolo's complaints concerned the opt-out provision and the Plan. Rugolo was not advancing the interests of, or serving as a representative for, the rank-and-file members of the union when he was "speaking out" against NYCDCC's leadership. Rather, he was speaking about issues that affected him as an employee of the union. As with Cavelli, no reasonable jury could infer that the harassment and intimidation Rugolo faced because he spoke out about employment-related issues impacted *union members'* freedom to speak out about *union issues*.

This case is analogous to cases involving the First Amendment rights of public employees. When considering the breadth of protection afforded public employees under the First Amendment, courts must "begin by considering whether the expressions in question were made by the speaker 'as a citizen upon matters of public concern.'" Garcetti v. Ceballos, 547

U.S. 410, 415-16, 126 S. Ct. 1951 (2006). "If the answer is no, the employee has no First Amendment cause of action based on his or her employer's reaction to the speech. If the answer is yes, then the possibility of a First Amendment claim arises." Id. at 418 (internal citation omitted); see also Connick v. Myers, 461 U.S. 138, 147, 103 S. Ct. 1684 (1983). And "[s]o long as employees are speaking as citizens about matters of public concern, they must face only those speech restrictions that are necessary for their employers to operate efficiently and effectively." Garcetti, 547 U.S. at 419, 126 S. Ct. 1951.

In utilizing this analytical framework, the Court sought to balance public employers' need to retain "a significant degree of control over their employees' words and actions," on the one hand; with the need to both "protect[] . . . the constitutional rights of public employees [and] . . . the public's interest in receiving the well-informed views of government employees engaging in civic discussion," on the other hand. Id. at 418, 419. Where, for example, "a public employee speaks . . . as an employee upon matters only of personal interest," the employee's constitutional rights and the public's interest in the speech are not implicated. See Connick, 461 U.S. at 147, 103 S. Ct. 1684. Accordingly, in those situations, the public employee would have no First Amendment claim if he is disciplined because of his speech.

Similarly, although the LMRDA does not ordinarily protect union employees' right to employment with the union, the Second Circuit has recognized that a union member's free speech rights under the LMRDA may be implicated when the union disciplines its employees for speaking out. Like in the public employee context, the union member's rights or interests are not implicated when a union employee speaks as an employee upon matters of his own personal interest. Because Cavelli and Rugolo were speaking about matters entirely within the scope of their employment with NYCDCC, the LMRDA is not implicated. Compare Connick, 461 U.S.

at 147, 103 S. Ct. 1684 ("[The First Amendment] does not require a grant of immunity for employee grievances . . . ."), with Franza, 869 F.2d at 47 ("[Section 101(a)(2) is not] a genie offering lifetime job security because [its free speech] rights would be backed by a right to bring an action for any loss of union employment.").

Finally, Cavelli and Rugolo's attempts to create a factual dispute about whether union members were afraid to speak out after their termination are unavailing. They rely on Anthony Agridiano's deposition and Frank Schiavone's affidavit. Agridiano, a union organizer, testified that he feared losing his job with NYCDCC if he swore out an affidavit to be used in the instant motion. His fears relating to his *employment* with NYCDCC do not allow for an inference that *members'* free speech rights were threatened.

Schiavone, a retired business representative, averred that "[a]fter [Cavelli and Rugolo were terminated], [he] felt afraid to vocally express objection or dissatisfaction with the Union or its policies." Even assuming the "direct threat to free speech rights" requirement can be satisfied with evidence that individual members subjectively feared speaking out – as opposed to an objective showing of such a threat – the mere fact that one union member was afraid to speak out against NYCDCC after Cavelli and Rugolo's termination is insufficient to support a reasonable inference that the termination threatened the freedom of union members to speak out. See FDIC v. Great Am. Ins. Co., 607 F.3d 288, 292 (2d Cir. 2010) ("Where it is clear that no rational finder of fact 'could find in favor of the nonmoving party because the evidence to support its case is so slight,' summary judgment should be granted.").

## CONCLUSION

Defendant's [52] motion for summary judgment is granted and the case is dismissed.

The Clerk of the Court is directed to enter judgment in favor of defendant.

**SO ORDERED.**

/s/(BMC)

_____
                    U.S.D.J.

Dated: Brooklyn, New York
       September 12, 2011